UNITED STATES of America,
Plaintiff–Appellee,

v.

Kevin Lee NELSON, Defendant–
Appellant.

No. 93–30460.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 2, 1995.

Decided Sept. 21, 1995.

Peter Goldberger, J.H. Feldman, Jr., Ardmore, PA, for the defendant-appellant.

Seth M. Galanter, United States Department of Justice, Washington, DC, for the plaintiff-appellee.

Before: SKOPIL, BOOCHEVER and THOMPSON, Circuit Judges.

BOOCHEVER, Circuit Judge:

Kevin Lee Nelson appeals his conviction for attempting and conspiring to structure a money laundering transaction. Undercover government agents posing as drug dealers came to the car dealership where Nelson worked, proposing to buy a car with cash. Nelson suggested ways to structure the cash purchase of a car to avoid the dealership's requirement under federal law to report cash transactions over $10,000. We reverse Nelson's attempt conviction, but affirm his conviction for conspiracy.

## FACTS

In 1992, the Internal Revenue Service ("IRS") learned that two Montana drug dealers had used cash proceeds from drug transactions to purchase cars from Prestige Toyota ("Prestige"), a car dealership in Billings. The IRS also had information that the sales had been structured to avoid the IRS requirement that a retail business file a reporting form whenever it receives more than $10,000 in cash, and that Prestige salesperson William Rahlf was involved in one of the sales.

The IRS began an undercover investigation. IRS Special Agent Pam White and Raymond Malley, an agent of the Montana Criminal Investigation Bureau, set up an appointment with Rahlf and arrived at Prestige on May 29, 1992. Agent White, using the name "Pam Wright," wore a transmitter to record their conversations. Rahlf took Agents White and Malley for a test drive in a Toyota 4–Runner, during which Agent White told Rahlf that she was "in the dope business" and Malley was her supplier. She added that she wanted to buy a car with cash, but did not want a "paper trail:" "I don't want anything in my name at all." Rahlf said "It's not a problem," and volunteered that he had previously sold cars to another drug dealer. Agent White asked him if his superiors would have any problems with the deal, and Rahlf answered "We've done it before, we can do it again." Rahlf added that "[i]t won't be a big deal" to use cash and title the car in another name.

Upon their return to the dealership, Agent White showed Rahlf a bundle of cash, which was in denominations of hundreds and twenties. Rahlf began to complete a "four-square," a form the salesperson fills out with the prospective customer's offer for a car. Rahlf asked Agent White the name and address she wanted to use. Agent White told him she would offer $22,000, asked him to use the name "Joyce Brown" and a post office box, and suggested he explain her situation to his superiors. She declined to sign the four-square form.

Rahlf took the four-square in to Randy Replogle, the assistant general sales manager, and appellant Kevin Nelson. Nelson was a sales manager or "closer," who helped salespersons finalize offers. As a closer, Nelson reported to the general sales manager or "desk," who had the final authority to put the deal together. Replogle was filling in as "desk" that day for Dustin Timmons, Prestige's general sales manager. Rahlf and Replogle discussed the deal, with Nelson present.

Rahlf told Replogle that the customers got their money from the drug business, and that they wanted to buy with cash and leave no paper trail. Replogle said he thought they should not get involved in the deal, and called the owner of Prestige, Ray McLean, at his home. McLean told him not to make the deal, and to get the customers out of the store. Replogle told Nelson to tell the customers to leave.

Rahlf and Nelson returned to Agents White and Malley, and Rahlf introduced Nelson, saying that he was aware of the situation. Nelson told Agents White and Malley that retail sellers must report any cash transaction over $10,000, and that Prestige would have to fill out a form to make such a report. He also told the agents they could use the name "Joyce Brown." Nelson went back in to talk to Replogle, telling the agents that the price was the likely sticking point.

Nelson told Replogle that the customers wanted to use an assumed name, and Replogle called McLean again, who reiterated that he wanted them to ask the customers to leave. Nelson returned to Agents White and Malley, telling them that Prestige would not falsify a name on the reporting form because that would be "fraud to the bank." After discussing whether it would be all right to use a different name if it were a real person, Agent White told Nelson that Joyce Brown was her sister. Nelson then said "The hell with it, let's do it. Let me go grab—grab a paper. Keep that pencil ready on site." Nelson left.

When he returned, Nelson told Agent White that Prestige could not use "Joyce Brown" on the reporting form. He then suggested another way to get around the reporting requirement: if Agent White were to come in with a trade-in to keep the cash price under $10,000, no form would be necessary. He said "I got probably ten good friends in the same situation but when they do it, they always come in and they trade something so they keep it under $10,000 ... so it doesn't have to be reported." He also suggested that Agent White consider buying two vehicles at Prestige for less than $10,000 each, which the dealership later could take back as trade-ins to keep the cash price of the 4–Runner below the reporting threshold. Nelson explained that he had done this "all the time" so that "we don't have the money trail." Nelson added that he was "more than willing" to do this: "All I want to do is cover my butt and cover yours at the same time." Nelson and Rahlf suggested the agents call Prestige the next day, and the agents left.

Later that evening, Rahlf contacted Jim Sinhold, a friend who worked as a salesperson at a Ford dealership, telling him that he had a female customer with "a purse full of money" who wanted to buy a car. Sinhold testified that Rahlf explained that "the deal didn't happen" at Prestige, and that Rahlf would send Agent White over. Although Rahlf testified that he thought he had told Sinhold that the customer was a dope dealer, Sinhold did not remember that, and thought Rahlf was looking for a referral fee for sending the woman over to the Ford dealership.

The next morning, when owner McLean arrived at Prestige, Nelson told him that he made the right decision when he turned down the deal the night before.

Agent White called Rahlf later that same morning. Rahlf told her that he and the agents "blew it" by telling Replogle the whole story, although Nelson was not the problem. Agent White told him the trade-in scheme sounded too complicated. Rahlf then put Prestige's general manager, Dustin Timmons, on the line, and Timmons told Agent White that she would have to get the trade-ins from other dealerships to avoid throwing up a flag. Agent White said the plan was not going to work for her. Rahlf then referred her to Sinhold at the Ford dealership to buy a Ford Explorer. Rahlf also stated "you don't need to tell [Sinhold] anything because I've already told him ... just do whatever it is you got to do and they'll ... make the paper work right."

Two days later, on June 1, 1992, federal agents entered Prestige with a search warrant and seized business records. Nelson and Rahlf were indicted in March 1993. On June 30, 1993, a jury found Rahlf and Nelson guilty of one count of conspiring to conduct or attempt to conduct financial transactions involving property represented to be the proceeds of unlawful controlled substance trafficking, with the intent to avoid a transaction reporting requirement, and one count of conducting or attempting to conduct such a financial transaction, both in violation of 18 U.S.C. § 1956(a)(3)(C). Nelson was sentenced to a ten-month "split sentence" in the pre-release center in Great Falls, Montana, with five months in the custody component and five months in the pre-release component of the center. His two years of supervised release were to start when he began the second of the five-month periods.

## I. *Sufficiency of the evidence*

■ There was sufficient evidence to support Nelson's conviction if, " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Harper*, 33 F.3d 1143, 1146 (9th Cir.1994), (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), *cert. denied*, —— U.S. ——, 115 S.Ct. 917, 130 L.Ed.2d 798 (1995).

■ 18 U.S.C. § 1956(a)(3)(C) (1992), in effect at the time of Nelson's charged conduct (there have since been some technical amendments), provided that whoever, intending "to avoid a transaction reporting requirement under State or Federal law, conducts or attempts to conduct a financial transaction involving property represented by a law enforcement officer to be the proceeds of specified unlawful activity," commits an offense punishable by fines and/or imprisonment for not more than twenty years. "[T]he term 'conducts' includes initiating, concluding, or participating in initiating, or concluding a transaction...." *Id.* at § 1956(c)(2). "Specified unlawful activity" includes violations of the narcotics laws. *Id.* at § 1956(c)(7)(A).

To prove a violation of this section, the Government must prove (1) that the defendant conducted or attempted to conduct a financial transaction, (2) with the intent to avoid a transaction reporting requirement, and (3) that the property involved in the transaction was represented by a law enforcement officer to be the proceeds of specified unlawful activity.

*United States v. Breque*, 964 F.2d 381, 386–87 (5th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1253, 122 L.Ed.2d 652 (1993).

The transaction reporting requirement alleged to have been violated in this case was 26 U.S.C. § 6050(I)(a) (1990), which requires any person engaged in business "who, in the course of such ... business, receives more than $10,000 cash in 1 transaction (or 2 or more related transactions)" to report the transaction to the IRS. Subsection (f) specifically provides that it is a violation of the statute to cause or attempt to cause a business to file a required return with a material misstatement of fact, or to structure or assist in structuring (or attempt to structure or assist in structuring) a transaction, for the purpose of evading the reporting requirements. 26 U.S.C § 6050(I)(f).

### A. *Proceeds*

■ Nelson first claims there was insufficient evidence that the cash involved was "represented by a law enforcement officer to be the proceeds of specified unlawful activi-

ty." 18 U.S.C. § 1956(a)(3)(C). Nelson argues that the government did not prove that Agents White and Malley specifically told Nelson that the cash was direct earnings from drug sales.

■ To establish a violation of the statute, the government need not show that the law enforcement officers explicitly stated that the cash in question was the direct product of unlawful activity. We have found sufficient evidence of a representation when the undercover operator "hinted, but never specifically stated, that the funds he needed laundered were proceeds from [drug] trafficking." *United States v. Castaneda*, 16 F.3d 1504, 1506, 1512 (9th Cir.1994); *see also United States v. Wydermyer*, 51 F.3d 319, 327–28 (2d Cir.1995) ("fact-specific" inquiry whether agent's statements sufficiently convey that money to be laundered derived from a specified offense); *United States v. McLamb*, 985 F.2d 1284, 1287, 1291 (4th Cir.1993) ("any person of ordinary intelligence" would recognize statements by undercover agent that the prospective car buyer has "problems ... with the drug people ... the money's not clean money" as representations that money was proceeds of illegal activity); *United States v. Kaufmann*, 985 F.2d 884, 892–93 (7th Cir.) (enough to find "representation" when agent told owner of dealership that interested purchaser of car was marijuana dealer and wanted car titled in a different name), *cert. denied*, —— U.S. ——, 113 S.Ct. 2350, 124 L.Ed.2d 259 (1993); *United States v. Jackson*, 983 F.2d 757, 766 (7th Cir.1993) (sufficient evidence where defendant purchasing car was involved in selling cocaine and had unexplained, substantial wealth); *United States v. Arditti*, 955 F.2d 331, 339 (5th Cir.) (where undercover agent told defendant he was in cocaine business and that some cash was proceeds of a collection, jury could have viewed cashier's check delivered later as drug-related funds), *cert. denied*, —— U.S. ——, 113 S.Ct. 597, 121 L.Ed.2d 534 (1992). To require government agents to be so specific would make it difficult for undercover agents to enforce § 1956(a)(3)(C), as real criminals would be unlikely to state explicitly the source of their funds. *See United States v. Castaneda–Cantu*, 20 F.3d 1325, 1332 (5th Cir.1994).

In this case, it is clear from Nelson's tape-recorded statements that Nelson believed Agent White was a drug dealer. *See Breque*, 964 F.2d at 387 (enough if defendant's responses reveal that he understood undercover agent's comments to mean that cash came from drug dealing). The jury had "the opportunity to ... hear the event at issue" when it listened to the tapes. *See United States v. Fuller*, 974 F.2d 1474, 1481 (5th Cir.1992) (jury could conclude that defendant knew funds were illicit proceeds where it saw and heard oblique conversation on videotape), *cert. denied*, —— U.S. ——, 114 S.Ct. 112, 126 L.Ed.2d 78 (1993). Further, Nelson was present when Rahlf told Replogle that the customers got their money from the drug business. The evidence was sufficient to show that Agent White represented the cash to be the proceeds of unlawful activity.

### B. *Intent to Avoid*

■ Nelson contends there was insufficient evidence that he acted with the intent to avoid the reporting requirement. He claims that before the jury could find intent, the prosecution had to show that Nelson violated (or attempted to violate) the reporting requirement by conducting a cash transaction over $10,000 without filing the required form, and that he attempted to avoid detection.

We reject this argument. Under Nelson's reasoning, no defendant would be liable under § 1956(a)(3)(C) for attempting to structure a cash transaction over $10,000 into smaller payments to avoid filing the report for a cash transaction over $10,000. The reporting requirement forbids just such "structuring" of cash transactions. 26 U.S.C. § 6050(I)(f)(1)(C). The evidence clearly shows Nelson's intent to structure the car purchase.

Nelson's argument that *Ratzlaf v. United States*, —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) requires a heightened element of "moral blameworthiness" is similarly misplaced. *Ratzlaf* addressed a money structuring statute with a "willfulness" requirement; § 1956 has no such requirement. *See United States v. Santos*, 20 F.3d 280, 284

n. 3 (7th Cir.1994) (*Ratzlaf* is inapplicable to § 1956).

## C. *Attempted or conspired to conduct*

Nelson argues that there was insufficient evidence to show that he attempted to conduct a financial transaction, or conspired to conduct such a transaction.

### 1. *Attempt*

■ Nelson claims that the evidence does not show that he attempted to initiate or to participate in initiating a car sale. Nelson argues that because he was not involved at the time Rahlf completed the four-square form, he took no substantial step toward the completion of the transaction, and all his other acts were mere preparation.

■ An attempt conviction requires evidence that the defendant intended to violate the statute, and that he took a substantial step toward completing the violation. *See United States v. Acuna,* 9 F.3d 1442, 1447 (9th Cir.1993). To constitute a substantial step, the defendant's actions must go beyond mere preparation, and must corroborate strongly the firmness of the defendant's criminal intent. *Id.* "The conduct must be necessary to the consummation of the crime and of such nature that a reasonable observer, viewing it in context, could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." *Id.* (quotation omitted).

Nelson advised Agent White that she could use "Joyce Brown," her "sister's" name, on the reporting form and took that idea inside to the "desk" (Replogle) for approval. Replogle told Nelson to ask the customers to leave. Telling the agents that he would do the transaction with a different name "in a heartbeat," but his superiors were unwilling, Nelson then proposed the trade-in scheme using vehicles purchased at Prestige or elsewhere for under $10,000. When the agents said they wanted to think it over and got up to leave, Nelson urged them to call him or Rahlf back.

■ We have already rejected Nelson's argument that § 1956 requires a higher level of intent than shown by his actions. There is no question that a jury could conclude that Nelson intended to violate the statute when he proposed structuring the car sale to avoid the reporting requirement. We now must determine whether a jury could find that Nelson's actions were a substantial step toward the violation. "It is admittedly difficult to draw the line between mere preparation to commit an offense, which does not constitute an attempt, and the taking of a substantial step toward commission of the crime, which does." *Harper,* 33 F.3d at 1147.

■ A substantial step is an "appreciable fragment" of a crime, an action of "such substantiality that, unless frustrated, the crime would have occurred." *United States v. Buffington,* 815 F.2d 1292, 1303 (9th Cir. 1987). In *Buffington,* the defendants drove past a bank twice. One defendant entered a store nearby and observed the bank, while two others, one disguised as a woman, exited their car in the bank parking lot and focused their attention on the bank. All were armed. Nevertheless, because there was no movement toward the bank and no indication that defendants planned to enter, this court found insufficient evidence of attempted bank robbery. *Id.*

■ Even when the defendant's intent is clear, his actions must "cross the line between preparation and attempt" by unequivocally demonstrating that the crime will take place unless interrupted by independent circumstances. *United States v. Still,* 850 F.2d 607, 609 (9th Cir.1988), *cert. denied,* 489 U.S. 1060, 109 S.Ct. 1330, 103 L.Ed.2d 598 (1989). A witness saw the defendant in *Still* putting on a long blonde wig while sitting in his van with the motor running, about two hundred feet from a bank. The defendant put the van into reverse and drove off when the police arrived. *Id.* at 610. Although after his arrest the defendant made it clear that he intended to rob the bank, the court held that the absence of facts establishing "either actual movement toward the bank or actions that are analytically similar" required the reversal of the attempt conviction. *Id.*

■ To constitute a substantial step, the defendant's actions must be a "true commitment" toward completing the crime. *Har-*

*per,* 33 F.3d at 1147–48. Defendants who created a "bill trap" in an automated teller machine ("ATM"), with the intent of robbing the ATM vault when technicians eventually would arrive to clear the trap, did not take a substantial step toward bank robbery because the robbery was in the future and the defendants, who were sitting in their car in the parking lot, had not moved toward the bank. *Id.* at 1147. *Cf. United States v. Smith,* 962 F.2d 923, 926, 930–31 (9th Cir. 1992) (sufficient evidence of "substantial step" toward possession of cocaine when defendant arrived with codefendant at house where cocaine was picked up, drove off later in another car, and circled parking lot of restaurant where cocaine deal was to take place before parking nearby with a shotgun in his lap); *United States v. Davis,* 960 F.2d 820, 827 (9th Cir.) (sufficient evidence of substantial step toward possession of cocaine with intent to distribute where defendant arranged meeting to discuss distribution and introduced parties when they arrived), *cert. denied,* —— U.S. ——, 113 S.Ct. 210, 121 L.Ed.2d 150 (1992); *United States v. Candoli,* 870 F.2d 496, 503 (9th Cir.1989) (defendants seen driving by business and parking up the street, who later were stopped driving away from business with plastic bottles of gasoline in the trunk, did not commit substantial step toward arson which occurred two weeks later).

This court has not addressed the conduct that will constitute a substantial step toward a violation of § 1956. Other circuits have found sufficient evidence of an attempt to violate the statute where defendants have done more than merely discuss possible ways to avoid reporting requirements. In *McLamb,* 985 F.2d at 1287, the Fourth Circuit affirmed the conviction of an owner of a car dealership for money laundering under 18 U.S.C. § 1956(a)(3). McLamb told a salesman to break up a $14,000 cash payment into two payments under $10,000 and assisted in the transaction, for which the dealership filed no reporting form. *Id.* at 1286. He advised an undercover agent in another transaction that there were ways to avoid reporting a cash purchase of a car, advised him to break up the payment so each transaction would be under $10,000, and again

discussed the deal when the agent arrived with the money, which the defendant turned over to the dealership. *Id.* at 1286–87. These steps "went far beyond mere preparation ... to characterize McLamb, on this evidence, as a mere passive observer of these goings-on, would defy reason." *Id.* at 1292. The Sixth Circuit found a substantial step when a car sale designed to conceal drug proceeds through the use of an assumed name and the avoidance of the reporting requirement was at least half completed. The defendant prepared a purchase agreement using the name of a fictitious third party, presented the agreement to the dealership's general manager for further paperwork, assured the buyer he would not file reporting forms, and accepted over $20,000 in cash when the buyer (an undercover agent) arrived to take possession of the car. *United States v. Loehr,* 966 F.2d 201, 202–03 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 655, 121 L.Ed.2d 582 (1992). In a case unrelated to the purchase of a car, the Fifth Circuit has found sufficient evidence that the defendant took a substantial step toward circumventing currency reporting requirements when

> [h]e prepared a plan, he refined it after communicating with an intended recipient of the money, he demonstrated the commercial reasonableness of the plan to the undercover agent, he received the money, and was on his way to deliver the money to the sanitizing agent in a foreign situs when he was arrested. If he had made delivery of the money the crime would have been perfected.

*Fuller,* 974 F.2d at 1479.

Nelson's actions in this case were far less definitive. Nelson discussed the assumed name scheme with Replogle, who had the final authority, and Replogle rejected it. He proposed the trade-in scheme to the agents, who said they would think it over. He continued to urge the trade-in idea when Agent White expressed reluctance. Nevertheless, Nelson's expressed eagerness to consummate the deal and his efforts towards doing so are evidence of intent, rather than evidence supporting a finding that Nelson took a step "of such substantiality that, unless frustrated,

the crime would have occurred." *Harper,* 33 F.3d at 1147 (quotation omitted). His actions are also consistent with his job, which was to keep customers on the hook while he helped the salesperson (Rahlf) finalize the offer, which is consistent with mere preparation. Nelson did not break up a cash payment already received, *McLamb,* 985 F.2d at 1286, complete paperwork or accept a cash payment, *Loehr,* 966 F.2d at 202, or prepare a detailed plan and receive payment. *Fuller,* 974 F.2d at 1476–77.

Nelson's actions were too "tentative and unfocussed" to be an appreciable fragment of the crime of avoiding a reporting requirement. *Still,* 850 F.2d at 609. Nor were they a step toward the commission of the crime so substantial that without an intervening act the crime would have occurred. *Id.* We agree that "[w]hen criminal intent is clear, identifying the point at which the defendants' activities ripen into an attempt is not an analytically satisfying enterprise." *Harper,* 33 F.3d at 1148. We conclude, however, that even viewing the evidence in the light most favorable to the government, the evidence does not show beyond a reasonable doubt that Nelson took a substantial step toward violation of the statute. His actions were mere preparation, and were not sufficient to show an attempt to launder money.

Nelson is also liable for the acts of his coconspirator after he and Rahlf began to conspire, under *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); the jury was so instructed. We conclude that Rahlf, his coconspirator, took no action that could be considered a substantial step after Nelson agreed with Rahlf to avoid the reporting requirement. Even Rahlf's call to Sinhold at the Ford dealership was a simple referral of the agents to another dealership. The transcript of the taped call shows that Rahlf did not discuss with Sinhold the details of how to structure the purchase, whether through trade-ins or the use of an assumed name on the paperwork.

Because the evidence does not support a finding that either Nelson or Rahlf took a substantial step toward violating § 1956 after Nelson joined the conspiracy, we reverse Nelson's conviction for attempt.

### 2. *Conspiracy*

Nelson also argues that there was insufficient evidence to sustain his conviction for conspiracy. "The essential elements of a conspiracy are (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *United States v. Litteral,* 910 F.2d 547, 550 (9th Cir.1990) (quotations omitted).

Any rational jury could find from the evidence of Nelson's conversations with Rahlf and the agents that he agreed with Rahlf to engage in the avoidance of the reporting requirement. As we discussed above, the evidence was also sufficient to show that Nelson intended to violate § 1956.

The remaining issue is whether the evidence supports a finding of an overt act. Although we have found the evidence insufficient to support a finding that Nelson took a substantial step toward avoiding the reporting requirement, "the overt act required as an element need not have as immediate a connection to the intended crime as the 'substantial step' required for an attempt." *Harper,* 33 F.3d at 1148. Nelson "need not have committed an overt act in furtherance of the conspiracy; he may still be convicted so long as one of his coconspirators did so." *United States v. Castro,* 972 F.2d 1107, 1110 (9th Cir.1992), *cert. denied,* ––– U.S. ––––, 113 S.Ct. 1350, 122 L.Ed.2d 731 (1993).

"When one agrees to be a member of a conspiracy, one agrees to all acts that have been or will be committed by the conspiracy, and, by virtue of that agreement, is responsible for such acts regardless of one's role in their commission." *United States v. Inafuku,* 938 F.2d 972, 974 (9th Cir.1991), *cert. denied,* 502 U.S. 1034, 112 S.Ct. 877, 116 L.Ed.2d 782 (1992). In this case, however, Nelson did not join an ongoing conspiracy when he agreed with Rahlf to avoid the reporting requirement. Until that point, Rahlf had entered into an agreement only with the agents, and no conspiracy exists when the only other persons involved are

government agents. *United States v. Schmidt*, 947 F.2d 362, 367 (9th Cir.1991). We therefore consider only Rahlf's actions following the beginning of Nelson's involvement.

Nelson twice went to talk with Replogle, the general manager, to discuss the possible use of the false name. Nelson suggested that the agents avoid the reporting requirement by buying and trading in other vehicles, to keep each transaction under $10,000 in cash. Rahlf involved Dustin Timmons, who advised the agents to purchase their trade-ins at other dealers to cover their tracks. Finally, Rahlf referred the agents to the Ford dealership, which would "make the paper work right."

From this evidence, a jury could conclude that at least one overt act took place to implement the agreement to avoid the reporting requirement. There was sufficient evidence to convict Nelson of conspiracy.

## II. *Reasonable doubt instruction*

 Although he did not object at trial, Nelson now claims it was plain error to instruct the jury as follows:

> The test [for conviction] is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense and may arise from a careful and impartial consideration of all the evidence or from lack of evidence. Proof beyond a reasonable doubt is proof that leaves you *firmly convinced* that the defendant is guilty.

(Emphasis added.) This court has found that such an instruction is not plain error, *United States v. Bustillo*, 789 F.2d 1364, 1368 (9th Cir.1986), or even simple error under de novo review. *United States v. Velasquez*, 980 F.2d 1275, 1278–79 (9th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 2979, 125 L.Ed.2d 677 (1993). *See also United States v. Taylor*, 997 F.2d 1551, 1557 (D.C.Cir.1993) (listing circuits finding "firmly convinced" language not to be reversible error).

## CONCLUSION

Because the evidence was insufficient for a reasonable jury to find beyond a reasonable doubt that Nelson took a substantial step toward initiating a financial transaction with the intent to avoid a reporting requirement, we reverse his conviction for attempt. There was sufficient evidence that Nelson conspired to avoid the reporting requirement, and we affirm his conviction for conspiracy.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED for resentencing.